CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED
July 30, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **ELSIE BROWN,**<br>Plaintiff | ) | Civil Action No. 1:25cv00019 |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| **FRANK BISIGNANO,**[1]<br>**Commissioner of Social Security,**<br>Defendant. | ) | By: PAMELA MEADE SARGENT<br>United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Elsie Brown, ("Brown"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

[1] Frank Bisignano, ("Bisignano"), became the Commissioner of Social Security on May 7, 2025. Pursuant to Federal Rules of Civil Procedure Rule 25(d), he is substituted as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Brown protectively filed an application for DIB on February 13, 2019, alleging disability as of July 10, 2018, based on irreversible chronic nerve damage; anxiety; depression; back pain; restricted use of the lower extremities; back brace and cane dependance; "24/7" pain in the back and legs; inability to drive; inability to sit, stand and walk for short periods of time; inability to shower, dress or do housework; inability to shop for groceries; and inability to lift, push or pull any weight. (R. at 245-51, 292, 910, 922.) The claims were denied initially and upon reconsideration. (R. at 148-52, 155-62.) Brown then requested a hearing before an administrative law judge, ("ALJ"), which was held on September 2, 2020, at which she was represented by counsel. (R. at 36-69, 163-64.) By decision dated September 10, 2020, the ALJ denied Brown's claims. (R. at 127-35.) After the ALJ issued his decision, Brown pursued her administrative appeals, and the Appeals Council entered an Order vacating the final decision of the Commissioner of Social Security and remanding the case to an ALJ for further consideration of Brown's functional limitations and residual functional capacity. (R. at 141-45.) Following a second hearing on May 25, 2021, an unfavorable decision was issued on June 28, 2021. (R. at 15-25, 70-100.) Brown then pursued her administrative appeals, and the Appeals Council denied review. (R. at 989-95.) Brown then appealed to this court, and the undersigned entered an order on January 13, 2023, granting the Commissioner's Motion to vacate the decision denying benefits and remanding the case to the Commissioner for further administrative proceedings. (R. at 997-98.) On January 11, 2024, Brown had a third hearing with an ALJ, at which she was represented by counsel. (R. at 930-66.)

By decision dated March 4, 2024, the ALJ denied Brown's claim. (R. at 910-22.) The ALJ found Brown met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018.[2] (R. at 911.) The ALJ found Brown had not engaged in substantial gainful activity from July 10, 2018, the alleged onset date, through December 31, 2018, the date last insured. (R. at 913.) The ALJ determined that, through the date last insured, Brown had severe impairments, namely, degenerative disc disease of the lumbar and thoracic spine and osteoarthritis. (R. at 913.) The ALJ found that, through the date last insured, Brown had not had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 915.) The ALJ found that, through the date last insured, Brown had the residual functional capacity to perform sedentary work[3], except she could only occasionally use foot controls and climb ramps or stairs; she could never climb ladders, ropes or scaffolds; she could occasionally kneel, crouch and crawl; she could never work at unprotected heights or around hazardous machinery or similar hazards; she could have no more than occasional exposure to extreme cold or vibration; and she required the use of a cane or other hand-held assistive device for all ambulation. (R. at 915.) The ALJ found that Brown was unable to perform any past relevant work. (R. at 920.) Based on Brown's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that, through the date last insured, a significant number of jobs existed in the national economy that Brown could perform, including the jobs of a document preparer, an

[2] Therefore, Brown must show she was disabled between July 10, 2018, the alleged onset date, and December 31, 2018, the date last insured, to be eligible for DIB benefits.

[3] Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2025).

addresser and a call-out operator. (R. at 921.) The ALJ concluded that Brown was not disabled from the alleged onset date through the date last insured. *See* 20 C.F.R. § 404.1520(g) (2025). (R. at 922.) Brown then appealed her decision to the Appeals Council, which declined her request to assume jurisdiction. (R. at 896-901.) Brown then filed this action seeking review of the ALJ's unfavorable decision, which now stabds as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2025). This case is before this court on Brown's brief, filed July 7, 2025, and the Commissioner's brief, filed August 6, 2025.

## *II. Facts*

Brown was born in 1973, (R. at 921), which, on the date last insured, classified her as a "younger person" age 45-49 under 20 C.F.R. § 404.1563(c). She testified at her initial hearing, on September 2, 2020, that she had a high school education. (R. at 48.) Brown said she had frequent back pain that became constant after she had surgery in April 2018. (R. at 52.) Brown said she experienced increased pain immediately after surgery, especially on her right side. (R. at 52.) Brown said half of her right foot was numb, which caused her to fall multiples times. (R. at 53.) Brown said her pain had not improved since surgery and felt like a thick burning rope. (R. at 53-54.) She said epidural injections relieved her pain for a couple of days to about a week, and she had a spinal cord stimulator, ("SCS"), surgically inserted in February 2019. (R. at 54-55.) Brown said the SCS did not change her symptoms, but did turn the pain into a different sensation. (R. at 55.) Brown said she had tried many medications, and she currently took gabapentin, Flexeril and Xanax, which relieved her pain only slightly. (R. at 55-56.) Brown said she used a cane to walk outside, but the cane had been prescribed only in 2020. (R. at 57.) Brown said she consistently had used a cane since August 2018 due to the instability in her ankle that had been present since surgery. (R. at 58.)

At the May 25, 2021, hearing, Brown again testified that she experienced increased pain immediately after her July 10, 2018, surgery. (R. at 85-86.) Brown affirmed that the pain felt like a rope that ran down her back all the way to her ankle and was stabbing, burning and constant. (R. at 86.) Brown testified that she had weakness in her right leg that caused her leg to give out, and she started using a cane "sometime in 2018" to support her right leg. (R. at 86-87.) Brown again testified that she received an SCS in 2019, which did not alleviate her pain but did distract her from pain, although it did not help her with sitting, standing or walking. (R. at 89.) Brown testified that she worked for her husband's real estate appraisal business, but she stopped working for him after her surgery because her pain distracted her so much that she began making mistakes at work. (R. at 90-91.)

At the third hearing, on January 11, 2024, Brown said she needed to use her hands or receive assistance to rise from a sitting position. (R. at 941.) She said she had difficulty with balancing, and she used a cane because her right foot would not work when she took a step. (R. at 942.) Heili Randall, a vocational expert, also was present and testified at the hearing. (R. at 953-64.) She testified that a hypothetical individual of Brown's age, education and work experience, who could perform sedentary work, who could occasional use foot controls; who could occasionally climb ramps and stairs; who could never climb ladders, ropes or scaffolds; who could occasionally kneel, crouch and crawl; who could not work around unprotected heights or around hazardous machinery or similar hazards; and who could have occasional exposure to extreme cold temperatures and vibration; would be able to perform the jobs of a document preparer, an addresser and a call-out operator. (R. at 953-54.) Randall testified that this hypothetical individual could perform Brown's past relevant work. (R. at 955.) Randall testified that the same hypothetical individual, but who required use of a cane for all ambulation, to rise from a seated

position and for balance and stability, would be able to perform the previously identified jobs as well as Brown's past relevant work. (R. at 956-57.)

On May 29, 2018, Brown underwent magnetic resonance imaging, ("MRI"), of the lumbar spine, which showed a small central disc protrusion at the L5-S1 level, which appeared to contact the S1 nerve root on the right. (R. at 441.)

On June 4, 2018, Brown saw Dayle Zanzinger, F.N.P., a nurse practitioner, for a primary care follow up. (R. at 512.) Brown complained of back pain that had gotten worse during a car ride to Nashville, and she was in obvious pain at her appointment. (R. at 512.) Zanzinger discussed various referral options for Brown's back pain, and she receivef pain medicine injections. (R. at 512.)

On June 25, 2018, Brown saw Dr. Mark Williamson, M.D., an orthopedic surgeon, for an initial evaluation of back and leg pain. (R. at 550.) Brown reported that her symptoms started for no reason and had been present for four months. (R. at 550.) Brown reported constant pain that was an eight out of 10. (R. 550.) Brown said that she was unable to carry out any activity without discomfort and that she could not work, sit, stand, walk, sleep, drive or go up and down stairs. (R. at 550.) Brown said her symptoms improved with a heating pad and lying flat on the floor. (R. at 550.) Brown said she had tried to relieve her pain with rest, exercise, nonsteroidal anti-inflammatory medications, ("NSAIDS"), heat, ice, massage, narcotic pain medication, oral steroids, nerve pain medication and muscle relaxant medication. (R. at 550.) On physical examination, Brown had altered sensation in the right lower extremity; there was tenderness in the back, back of the right calf and lateral foot and toes; there was weakness to plantar flexion and eversion of the foot; straight leg raise testing was positive; Brown was walking intolerant; there was tenderness to palpation of the lumbosacral junctional area and into the right buttock and hamstring

area; paraspinal muscle spasm was present; and she had a restricted range of motion in all directions. (R. at 551.) Dr. Williamson diagnosed a lumbosacral disc herniation at the L5-S1 level on the right, for which he recommended a microdiscectomy and stated that Brown had a "reasonable chance of symptom improvement." (R. at 551-52.)

On July 10, 2018, Dr. Williamson performed this microdiscectomy on the L5-S1 levels on the right. (R. at 572.) On July 23, 2018, Brown saw Dr. Williamson for a post-surgical follow up. (R. at 553.) Brown reported numbness in her right second toe and said her right foot "gives out," but she stated that her back was doing well, she felt better overall, and she was working some. (R. at 553.) Brown stated that she had resumed chiropractic care. (R. at 553.) On physical examination, there were no focal neurologic deficits noted in the lower extremities; Brown's spine was in normal alignment; and there was mild tenderness to the lumbosacral spine with mild paraspinal muscle spasm. (R. at 553.) Dr. Williamson prescribed prednisone, instructed Brown to continue chiropractic care, to take NSAIDS as necessary and to follow up in two weeks. (R. at 553-54.)

Brown received chiropractic care from Samuel K. Boothe, D.C., from July 17, 2018, to January 4, 2019. (R. at 473-502.) Brown complained of dull and aching upper thoracic and lumbar discomfort, as well as intermittent numbness in three of her right toes. (R. at 502.) On July 20, 2018, Boothe said that Brown was improving because she was reporting less discomfort and showing improved function. (R. at 500.) On July 24, 2018, Boothe reported that Brown's surgeon was pleased with her progress from chiropractic care, and he again noted that she was improving because she was reporting less discomfort and showing improved function. (R. at 499.)

On August 6, 2018, Brown saw Dr. Williamson, reporting back and right leg pain. (R. at 555.) Brown stated her pain had not improved since her surgery and that it may actually be worse. (R. at 555.) Brown stated that right after surgery, she had pain in the right hip, and her right foot and toes were numb. (R. at 555.) Brown said she was limited in function by the pain and symptoms, including being unable to play with her grandchildren and sleep, and she said she used a cane when walking outside due to fear of falling. (R. at 555.) Brown stated that she had stopped seeing her chiropractor because of the pain. (R. at 555.) On physical examination, Brown had altered sensation in the right lower extremity; tenderness in the lower back and right lower extremity; straight leg raise testing was positive; she was walking intolerant; there was tenderness to palpation in the lumbosacral junctional area and into the right buttock and hamstring area; there was paraspinal muscle spasm; and she had restricted range of motion in all directions. (R. at 555.) Dr. Williamson diagnosed recurrent herniated disc and lumbar spondylosis with radiculitis, and he ordered imaging of the lumbar spine, administered an intramuscular injection of Toradol and Celestone, and he recommended continued chiropractic care and follow up in one week. (R. at 556.)

On August 10, 2018, Brown underwent MRI imaging of the lumbar spine, which showed a recent right hemilaminotomy at L5-S1 with expected postsurgical changes in the epidural space and posterior annular remnant, with no evidence of recurrent disc extrusion. (R. at 435.)

On August 11, 2018, Brown presented to the emergency room at Johnston Memorial Hospital for complaints of post-surgical back pain. (R. at 415.) Brown endorsed lower back pain with radiation down the right leg. (R. at 415.) Brown denied urinary retention, loss of bowel control, gait disturbance and saddle anesthesia. (R. at 415.) Brown said she had recently taken Tramadol, but it caused

her to vomit and develop a headache. (R. at 415.) She had pain in the lumbar spine and positive right straight leg raise testing, but physical examination was, otherwise, normal. (R. at 416.) Brown was diagnosed with low back pain with right-sided sciatica; nausea and vomiting; and vertigo. (R. at 417.) Brown was treated with a migraine cocktail and discharged the same day in stable condition with prescriptions for meclizine, diclofenac and Zofran. (R. at 417.)

On August 13, 2018, Brown saw Dr. Williamson, complaining of severe right leg pain. (R. at 557.) Brown reported using a cane and putting a bed in her office so that she could continue to work. (R. at 557.) On physical examination, Brown had altered sensation in her right lower extremity, with weakness to manual muscle testing and diminished reflexes; there was tenderness to palpation in the lumbosacral junctional area and into the right buttock and hamstring area; there was paraspinal muscle spasm; and she had restricted range of motion in all directions. (R. at 557.) Dr. Williamson prescribed Toradol and referred Brown to pain management. (R. at 558.)

On August 16, 2018, Brown saw Dr. Walter Wofford, M.D., for pain management. (R. at 669.) Brown reported eight out of 10 pain in her back, right lower extremity and hip. (R. at 669.) She had right foot weakness in dorsiflexion and plantarflexion, as well as peroneal weakness in the brace position. (R. at 674.) Brown's reflexes were 2/4 in both patella/Achilles, with no clonus in the bilateral lower extremities. (R. at 674.) Dr. Wofford diagnosed lumbar radiculopathy/radiculitis; lumbosacral degenerated disc; lumbosacral spondylosis without myelopathy; myofascial pain; post laminectomy syndrome of the lumbar region; neuralgia; and a history of falling, presenting hazards to health. (R. at 674.) Dr. Wofford recommended a transforaminal epidural and continued Brown's medications. (R. at 675.) He noted she might be a good candidate for an SCS. (R. at

675.) She also had right L5 dermatomal pain. (R. at 674.) On August 30, 2018, Brown again saw Dr. Wofford for pain management. (R. at 618.) Brown said she had pain in her lower back, right leg and right foot. (R. at 618.) She said the pain was aching, throbbing, shooting, stabbing, sharp, tender, burning, exhausting, numb, miserable, unbearable and continuous. (R. at 618.) Brown said the side effects of her pain were a five out of 10 in severity. (R. at 618.) Brown said that injections provided no pain relief. (R. at 618.) On physical examination, Brown had pain over the right piriformis that radiated into the right dorsal foot. (R. at 622.) Dr. Wofford diagnosed right piriformis syndrome, and he administered a steroid injection in the right piriformis and discussed trialing an epidural injection in the L5-S1 and right L5. (R. at 616-17, 623.) Dr. Wofford also discussed an SCS as a next step and prescribed gabapentin. (R. at 623.)

On September 13, 2018, Brown saw Dr. Wofford for pain management, reporting that the gabapentin and steroid injection she had received at her previous appointment provided mild pain relief and improvement of function. (R. at 610.) On physical examination, Brown wore a brace on her right foot; she had chronic gait abnormality; and she continued to report dysthesia into the right L5 dermatome and dorsum of the right foot that worsened with neural tension. (R. at 614.) Dr. Wofford diagnosed lumbago; lumbar radiculopathy/radiculitis; lumbosacral degenerated disc; neuralgia; and post-laminectomy syndrome of the lumbar region. (R. at 614.) Dr. Wofford noted that Brown saw limited to no benefit from the steroid injection and continued to have gluteal soreness on exam and L5 dermatomal pain. (R. at 615.) On review of her MRI, Dr. Wofford noted more impact on her S1, and administered an interlaminar and single nerve root block at S1. (R. at 608-09, 615.) Dr. Wofford discussed an SCS if the S1 injection did not provide relief, but Brown was hesitant about the procedure. (R. at 615.) Her dosage of gabapentin was increased. (R. at 615.)

On September 24, 2018, Brown saw Dr. Williamson for continued pain in her right leg. (R. at 559.) Brown said that her pain affected her ability to walk, work, drive and do housework. (R. at 559.) Brown said that she had received injections at Northern Pain Management and was being evaluated for an SCS. (R. at 559.) She was using a Velcro brace on her right ankle and requested a prescription for a new one. (R. at 559.) On physical examination, Brown had tenderness to palpation in the lumbosacral junctional area and into the right buttock and hamstring area; there was paraspinal muscle spasm; she had restricted range of motion in all directions; she had altered sensation in her right lower extremity; there was tenderness in the back and right lower extremity; there was weakness to plantar flexion and eversion of the foot; straight leg raise testing was positive; and she was walking intolerant. (R. at 559.) Dr. Williamson diagnosed chronic pain, he instructed Brown to stay active, he prescribed a right ankle brace, and he recommended that Brown continue to see pain management. (R. at 559-60.)

On September 26, 2018, Brown underwent a nasal septal reconstruction revision surgery at Johnston Memorial Hospital, which was completed without complication. (R. at 402-03.)

On October 10, 2018, Brown saw Dr. Wofford for pain management. (R. at 602.) Brown reported mild relief with gabapentin and said that the injections she received at her previous appointment provided mild pain relief and improvement of function for less than a month. (R. at 602.) Dr. Wofford increased Brown's gabapentin and discussed a trial of a dorsal column spinal stimulator, and Brown agreed to proceed with the procedure. (R. at 607.) Dr. Wofford ordered imaging of the thoracic spine to rule out epidural fibrosis or stenosis in the thoracic canal. (R. at 607.)

On October 15, 2018, Brown saw Dr. Mario Zapata, M.D., for a mental health evaluation in preparation for the SCS. (R. at 380.) Brown endorsed pain that averaged six to seven on a 10-point scale and radiated down her right leg. (R. at 380.) Brown denied major issues with her mood and denied major depressive disorder. (R. at 380.) Brown endorsed smoking less than one pack of cigarettes a day and reported taking gabapentin, Xanax, atorvastatin and Prilosec. (R. at 380.) Dr. Zapata noted that Brown had "slight difficulty due to her sciatic pain," but mental status examination was, otherwise, normal. (R. at 381.) Dr. Zapata diagnosed adjustment disorder, mixed, and chronic pain syndrome, and he found that Brown had no major psychological contraindication to receiving a spine stimulator. (R. at 381.)

On October 17, 2018, Brown was briefly hospitalized for repair of her recent nasal septal reconstruction after a motor vehicle accident. (R. at 397.) During her hospitalization, she had a normal gait. (R. at 395, 400.) After the revision, Brown was restricted from bending, lifting and strenuous activity. (R. at 401.) An MRI study completed on October 18, 2018, showed very small disc protrusions at T3-4, T4-5 and T5-6 without canal or foraminal stenosis. (R. at 392.)

On December 28, 2018, x-ray imaging of Brown's lumbar spine was normal. (R. at 386.) Imaging of the left hip also was normal, showing no bony, joint or soft tissue abnormality. (R. at 387.)

On February 5, 2019, Brown saw Dr. Wofford for an SCS trial. (R. at 601.) Brown said that she felt drowsy on gabapentin, and Dr. Wofford instructed her to taper down her dose. (R. at 601.) The SCS trial device was placed successfully. (R. at 593-94.) On February 8, 2019, Brown followed up with Dr. Wofford and reported she had greater than 75 percent pain relief with the SCS trial. (R. at 587.) Brown said

that she was considering a permanent implant and requested to continue the trial over the weekend. (R. at 587.)

On February 18, 2019, Brown saw Zanzinger with complaints of right leg and knee swelling, which Zanzinger suspected was a Baker's cyst.[4] (R. at 507.) Brown reported that she had received a temporary SCS, which had provided 60 to 70 percent relief. (R. at 507.) Zanzinger ordered an x-ray and ultrasound of the right lower extremity and refilled Brown's Xanax prescription. (R. at 507.) An x-ray of the right knee conducted the next day was normal, with no acute findings. (R. at 506.) A deep venous ultrasound of the right lower extremity was normal, with no evidence of thrombi. (R. at 505.)

On March 4, 2019, Brown saw Dr. Williamson for continued back, right hip and right leg pain. (R. at 561.) Brown reported her symptoms had been present for 18 months and recently became acutely worse. (R. at 561.) Brown said her pain was constant and a severity of nine out of 10. (R. at 561.) Brown said her symptoms worsened by moving about, sitting or standing too long, walking, trying to sleep, exercise, driving, working, going up and down stairs and trying to put socks and shoes on. (R. at 561.) Brown did not report relief with rest, exercise, heat, ice, massage, narcotic pain medication, oral steroids, nerve pain medication, muscle relaxant medication, injections, spinal injections, braces, splints, wraps, physical therapy, chiropractic care and formal pain management. (R. at 561.) Brown said she was evaluated at Northern Pain Management in July 2018 and completed a trial study with an SCS from Boston Scientific. (R. at 561.) Brown said she was more active and could do a lot more daily tasks during the use of the trial device. (R. at 561.) She

[4] A Baker's cyst is a benign fluid-filled sac that forms on the posterior aspect of the knee and usually does not require treatment. *See* https://www.ncbi.nlm.nih.gov/books/NBK430774/ (last visited June 29, 2026).

said she did not experience tingling and pain with her trial device. (R. at 561.) Brown was excited and said she wanted to continue with the permanent dorsal column SCS, saying that she was more active and could grocery shop, do laundry and walk without a cane. (R. at 561.) Brown said she felt that the trial device relieved more than 60 percent of her pain. (R. at 561.) On physical examination, Brown had tenderness to palpation in the lumbosacral junctional area and into the right buttock and hamstring area; there was paraspinal muscle spasm; she had restricted range of motion in all directions; she had altered sensation in the right lower extremity; there was tenderness in the back and right lower extremity; she had weakness to knee extension, inversion of the foot and dorsiflexion of the foot; straight leg raise testing was positive; and she was walking intolerant. (R. at 562.) Dr. Williamson diagnosed post-laminectomy syndrome. (R. at 562.) He discussed the SCS with Brown, and they agreed to proceed with the procedure. (R. at 563.)

On April 2, 2019, Dr. Williamson performed a laminectomy for implantation of a neurostimulator electrode and insertion of a spinal neurostimulator pulse generator. (R. at 548.) The procedure was completed without complication. (R. at 548.) Imaging showed that the implant was placed correctly. (R. at 569-70.)

On May 7, 2019, Brown saw Dr. Wofford for a pain management follow up. (R. at 581.) Brown used a cane on the right for gait, and, on physical examination, her SCS wound was healing well. (R. at 585.) Brown's diagnoses remained the same, and Dr. Wofford noted that Brown was doing well on gabapentin and with the SCS. (R. at 586.)

On August 15, 2019, Brown contacted Zanzinger requesting a refill of her medications. (R. at 681.) Zanzinger noted Brown still was having problems with her back and that she walked with a cane. (R. at 681.) On August 22, 2019, Brown saw

Zanzinger, requesting a referral for counseling. (R. at 679.) She reported continued back pain. (R. at 679.)

An undated, unsigned note marked "patient statement" present in the record states:

> Elsie states even with a cane and brace she still falls. Even though the spine stimulator and medicines together reduce some of her constant 24/7 pain, if she turns up the spine stimulator enough to help with pain more it pulls/draws her leg and she is unable to get out of bed at all. Also it wears her out to complete exhaustion, but if she [doesn't] turn it up the medicines are not enough to dull [some] of her pain to a level she can deal with without going crazy. Due to this ongoing situation that is irreversible this causes her mental anxiety and depression.

(R. at 684.)

On October 21, 2019, Brown saw Zanzinger, requesting a referral for a psychiatrist or psychologist. (R. at 716.) She said she continued to have chronic back pain and was very limited in the activities she could do. (R. at 716.) She said she was unable to work because she was making too many mistakes. (R. at 716.) Brown said if she turned her SCS up too much, she could not concentrate. (R. at 716.)

On November 11, 2019, Brown saw Zanzinger, stating she no longer had a pain doctor. (R. at 714.) Zanzinger prescribed gabapentin, which Brown said she needed to get out of bed in the morning. (R. at 714.) She said she turned her SCS up when she had intense pain, but she was still in pain. (R. at 714.) Zanzinger referred her to physical therapy and prescribed Lyrica to help her pain. (R. at 714.)

Brown attended physical therapy at Benchmark Physical Therapy from November 13, 2019, to December 31, 2019. During her initial evaluation, Brown

reported 10 out of 10 pain and said she had moderate pain and difficulty with all activities of daily living. (R. at 844.) She ambulated with decreased speed, step length and cadence, bilaterally, and she used a cane due to pain and balance deficits. (R. at 846.) She was able to bend forward and remove her shoes and socks, but had slowed, painful and aberrant movement patterns. (R. at 846.) She was prescribed 12 physical therapy visits over a period of six weeks. (R. at 850.) On November 15, Brown reported 10 out of 10 pain. (R. at 838.) On November 19, Brown reported 10 out of 10 pain, she could not find relief for her pain and physical therapy was making her feel worse. (R. at 833.) On November 26, Brown reported four out of 10 pain and said she was feeling better. (R. at 828.) She reported feeling much better than her previous visit and found relief from doing stretches at home. (R. at 830.) On November 29, Brown reported nine out of 10 pain and said recent travel was causing her to have increased pain. (R. at 823.) On December 2, Brown reported seven out of 10 lower back pain and said she had been using her back massager and SCS more because she felt stiff. (R. at 818.) On December 5, Brown reported nine out of 10 lower back and right hip pain. (R. at 813.) On December 9, Brown reported eight out of 10 pain in her lower back and right hip. (R. at 807.) She reported discontinuing Lyrica. (R. at 807.) On December 12, Brown reported five out of 10 pain, but said her pain the previous day was 10 out of 10. (R. at 801.) On December 17, Brown reported seven out of 10 pain in her lower back and right hip. (R. at 794.) She reported that physical therapy had not changed her pain level, but it had increased her strength, and she was able to tolerate sitting longer. (R. at 795.) She walked with a decreased speed and used a cane due to pain and balance deficits. (R. at 796.) On December 26, Brown reported 8 out of 10 pain. (R. at 789.) It was noted she had poor treatment tolerance and fair progress towards her goals. (R. at 791.) On December 31, Brown reported five out of 10 pain in her lower back and right hip. (R. at 780.) At this final session, she was noted to have made fair progress towards her goals and had made some improvement, although her functional deficits and

limitations had not improved. (R. at 786.) She reported her pain had not improved substantially with physical therapy, but dry needling used during some sessions improved her symptoms for one to two days afterwards. (R. at 786.) It was noted she had multiple psychosocial behavioral tendencies which appeared to be contributing to her chronic back syndrome and symptoms. (R. at 786.)

Brown saw Zanzinger on January 13, 2020, for follow up. (R. at 713.) She said Lyrica did not really help, and she restarted gabapentin. (R. at 713.) She felt depressed and fatigued because of her pain. (R. at 713.) She was going to physical therapy and said dry needling helped her pain. (R. at 713.) Zanzinger prescribed Cymbalta. (R. at 713.) When Brown saw Zanzinger on February 10, 2020, she said she had tried Cymbalta for her mental health, but it caused confusion, and she reported increased back pain. (R. at 710.) She said she was attending physical therapy, and  it had helped some. (R. at 710.) Zanzinger prescribed Zanaflex and refilled Brown's Xanax. (R. at 710.)

On January 13, 2020, Brown underwent a physical therapy evaluation for dry needling at Benchmark Physical Therapy. (R. at 772.) She was prescribed seven visits, one every other week, but ultimately attended only three appointments. (R. at 772-73.) On January 14, 2020, she had her first physical therapy appointment, and she responded well to the therapy with improved management of symptoms and decreased muscle guarding. (R. at 778.) On February 4, 2020, Brown reported six out of ten lower back and right hip pain, and she had an antalgic gait. (R. at 775.)Her tolerance to treatment and her prognosis both were described as good. (R. at 776.) On March 3, 2020, Brown reported six out of ten lower back and right hip pain, and her gait remained antalgic. (R. at 770.) On April 9, 2020, Brown was discharged from physical therapy for noncompliance because she had not attended an appointment in almost a month. (R. at 770.) She reported improvement in her overall

muscle tightness and pain. (R. at 771.) Brown's discharge prognosis was good. (R. at 771.)

Brown completed another physical therapy evaluation at Benchmark Physical Therapy on June 23, 2020. (R. at 717.) Adam Pugh, D.P.T., Brown's physical therapist, completed a Clinical Assessment of Pain form, finding that Brown's pain was present and incapacitating; physical activity, such as walking, standing and bending increased her pain to the extent that medication and/or bed rest was necessary; and that medication impacted Brown's work ability to the extent that it would severely limit her effectiveness in the workplace due to distraction, inattention and drowsiness. (R. at 852.) She reported pain in her right shoulder and back that was a nine out of 10 in severity. (R. at 762.) She was assessed with acute cervicalgia, right shoulder pain and chronic lumbar radiculopathy. (R. at 767.) On June 26, 2020, Brown reported seven out of 10 shoulder pain. (R. at 747.) She responded well to therapy, with improved management of symptoms and decreased muscle guarding. (R. at 751.) On June 29, 2020, Brown reported five out of 10 pain in her shoulder and lower back. (R. at 740.) She responded well to therapy, with improved management of symptoms and decreased muscle guarding, and she had improved, pain-free range of motion. (R. at 745.) On July 10, 2020, Brown reported eight out of 10 shoulder and back pain. (R. at 733.) She reported losing her SCS charger so she was in more pain than usual. (R. at 733.) Dry needling caused her to become dizzy and nauseated, but, regardless, she responded well to the intervention with improved management of symptoms and decreased muscle guarding and tone. (R. at 737.) On July 14, 2020, she reported six out of 10 pain and said she heavily medicated herself before coming to physical therapy. (R. at 726.) She responded well to the therapy, with improved management of symptoms and decreased muscle guarding. (R. at 730.) On August 7, 2020, she reported six out of 10 shoulder and low back pain. (R. at 718.) She had good improvement in her overall range of motion

and activity tolerance; however, her progress was noted to be slower than expected due to lack of compliance with therapy. (R. at 723.) She attended six out of 13 scheduled therapy sessions. (R. at 717.)

Brown saw Zanzinger on July 6, 2020, complaining of pain in her neck and both legs down to her knees. (R. at 855.) She reported recent exercise and stepping in a hole aggravated her pain. (R. at 855.) Zanzinger injected pain medications and prescribed Phenergan and Ultram. (R. at 855.) Brown saw Zanzinger on August 10, 2020, requesting a standalone cane for ambulation, which Zanzinger prescribed. (R. at 854.)

On August 17, 2020, Brown saw Erica Forrester, D.P.T., a physical therapist, who completed a Disability Questionnaire Functional Testing Component form. (R. at 867-68.) Brown said, in an eight-hour day, she could not stand, sit, walk, or drive. (R. at 867.) Forrester found Brown could not use her upper extremities for grasping, pushing/pulling or fine manipulation. (R. at 867.) She found Brown could occasionally bend at the waist with support, she could frequently reach above the shoulder, and she could never squat, climb, kneel, crawl, drive or use foot controls with the right lower extremity. (R. at 867-68.) She found that, in an eight-hour day, Brown was unable to perform lifting and carrying activities. (R. at 868.) Lastly, Forrester noted:

> [Brown] ambulates into the facility with use of a [single point cane], donning a knee brace, ankle brace and requires the hand held assistance of her sister. Per objective testing [Brown] is at a high fall risk. She required at least minimal assistance with all transfers completed in the clinic today as well as use of her cane. Coordination deficits are present to [Brown's right lower extremity and bilateral upper extremities. She] reported increased pain and fatigue with all

> physical testing completed. She required a break [on] left side lying to relieve pain to be able to finish out physical examination.

(R. at 868.)

On April 22, 2021, Brown saw Zanzinger, requesting gabapentin because she continued to have back pain. (R. at 891.) She reported using a cane when walking and said she was not very active. (R. at 891.) She reported doing physical therapy exercises at home, and she said acupuncture helped her pain more than dry needling, but her insurance would not cover it. (R. at 891.) Zanzinger prescribed Lyrica. (R. at 891.) Brown saw Zanzinger on June 22, 2021, complaining of neck and shoulder pain, secondary to a fall. (R. at 856.) She had decreased range of motion, especially on the right. (R. at 856.) Zanzinger ordered x-rays. (R. at 856.)

On June 15, 2022, Brown saw Jamie Hayden, F.N.P, a nurse practitioner at Family Physicians of Marion, requesting refills of her medication. (R. at 1188.) She said she no longer was seeing any specialists for her back pain. (R. at 1188.) When Brown saw Hayden on September 23, 2023, She endorsed lower back pain with radiculopathy and stated the remote control for her SCS was not working. (R. at 1182.) She said the SCS was the only thing that helped her back pain, and she was miserable. (R. at 1182.) Hayden completed a form for a new remote control. (R. at 1182.)

## *III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2025). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires

the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2025).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Brown argues the ALJ erred by failing to properly evaluate the medical necessity of Brown's use of a cane for balance when he formulated the residual functional capacity. (Plaintiff's Brief at 10-16.) Specifically, Brown argues the ALJ erred by asserting that Brown required a cane for ambulation only, and not also for balance/stability and positional changes. (Plaintiff's Brief at 10.) Brown also argues that the ALJ's residual functional capacity assessment is not based on substantial evidence because the ALJ improperly substituted the medical opinions with his own lay opinion in crafting it. (Plaintiff's Brief at 17-22.)

Social Security Ruling 96-9p requires consideration of the impact of medically required hand-held assistive devices. In order to establish that a hand-held device is medically required, there must be medical evidence establishing both the need for the device to aid in walking or standing, and the circumstances under which the device is required. *See* S.S.R. 96-9p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013). Self-reports and references in the record from physicians that a claimant presented with an assistive device are not sufficient; there must be "an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary." *Tripp v. Astrue*, 489 F. App'x. 951, 955 (7th Cir. 2012). In this case, the ALJ found that Brown required a cane or hand-held assistive device for ambulation, stating in his residual functional capacity that Brown "required the use of a cane or other hand-held assistive device for all *ambulation*." (R. at 915) (emphasis added). Brown contests only that the ALJ erred in not also requiring a cane for balance/stability and positional changes. Brown asserts the ALJ impermissibly cherrypicked evidence, but this is not supported by the ALJ's opinion. Brown cites to numerous medical records, nearly all of which were discussed thoroughly by the ALJ. In his opinion, the ALJ found that Brown did not require a cane for balance/stability and positional changes, in addition to ambulation, stating:

The allegations regarding the claimant's back condition and cane use are partially consistent with other evidence during the period at issue. Treatment records show that the claimant underwent a right microdiscectomy at L5-S1 on July 10, 2018, the alleged onset date, due to a herniated disc at L5-S1 that appeared to contact the S1 nerve root on the right (5F/2-3, 6F/7). She also had small disc bulges in her thoracic spine as seen in imaging (2F/8). After the microdiscectomy, the claimant complained of low back pain with associated right leg and foot pain, numbness, and weakness (e.g., 1F/1, 3F/31). She generally described the symptoms as worsening as of August 2018, and reported falling once (3F/21-24). She told providers she used a cane, brace, and right ankle brace (5F/16, 8F/44). She later reported that the symptoms improved and then worsened again after she did some housework (3F/18-19). The claimant's surgeon gave her a prescription for a right ankle brace and referred her to pain management (5F/21). Despite treatment with chiropractic modalities, pain medications, and injections, the claimant continued to complain of pain and lower extremity symptoms after that (e.g., 4F/5, 7F/17, 7F/23). Physical examinations prior to the [date last insured] showed altered sensation and tenderness in the right leg and foot, right foot weakness, lumbar spine tenderness with muscle spasm and restricted range of motion, positive straight leg raise testing, and "walking intolerant" (5F/16-20). The claimant wore a brace on her right foot and had chronic gait abnormality in one visit (7F/35). Her providers recommended [SCS] therapy (1F/2, 7F/28), and the claimant eventually underwent permanent SCS implantation in April 2019 (6F/2-5). She later participated in physical therapy, but continued to report some pain and radicular symptoms after the [date last insured] (12F). She requested a cane and was prescribed a "standalone cane for ambulation" in August 2020 (15F/1). Based on the foregoing, including the claimant's reports of back and lower extremity symptoms, self-reported cane use, SCS implantation, and eventual prescription for a cane after the [date last insured], the undersigned concludes that the claimant was restricted to a range of sedentary exertion work with postural and environmental limitations as set forth above to avoid exacerbating the symptoms, and required the use of a cane or other hand-held assistive device for all ambulation.

However, the allegations regarding the degree to which the claimant relied on a cane are not entirely consistent with other evidence

> through the [date last insured]. At the hearing and in a post-hearing brief, the claimant's representative argued that the claimant required a cane for balance/stability and positional changes, in addition to ambulation (31E). These asserted limitations do not find support in the record during the relevant period. For example, during an emergency room visit in August 2018, the claimant endorsed pain and vertigo but denied gait disturbance (2F/31-35). She had a steady gait on examination. Her extremities all appeared grossly normal, with no appreciated pain with palpation (2F/32). Another provider observed that the claimant ambulated without assistance during the same encounter (2F/37). Similarly, physical examinations by other hospital providers in September 2018 and October 2018 showed normal gait, with no noted mention of cane use (2F/11, 2F/16). During a psychological evaluation for SCS therapy in October 2018, the claimant was observed to have "slight difficulty due to her sciatic pain" but was otherwise pleasant with intact mental status examination findings (1F/2). Though the claimant's pain management provider noted in May 2019 that she "use[d] cane on the right for gait" (7F/6), earlier treatment notes from the same provider do not show similar findings of cane use (7F/21, 7F/27, 7F/35, 7F/43). Moreover, an MRI of the claimant's lumbar spine in August 2018 showed no evidence of a recurrent disc extrusion. There was a minimal disc bulge at L5-S1 with a protruding annular remnant, but the central canal was normal, and the exiting and transiting nerve roots at L5-S1 were normal (2F/51). X-ray imaging of the claimant's lumbar spine and left hip in December 2018 showed normal findings (2F/2-3). X-ray imaging of her right knee in September 2019 also showed normal findings (4F/4). Overall, the allegations as to the claimant's degree of reliance on a cane are not entirely consistent with other evidence, including multiple physical examinations showing no observed cane use prior to the [date last insured], mild findings seen in imaging studies, and the overall objective medical evidence.

(R. at 917-18.)

In accordance with the regulations, the ALJ considered the longitudinal record related to Brown's cane use. To the extent those records presented conflicting evidence as to the extent of Brown's cane use, the ALJ resolved those conflicts by limiting Brown to sedentary work and the use of a cane for ambulation. It is not

within this court's purview to second-guess that decision. *See Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]."); *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (unpublished) ("There were a number of conflicts in the evidence here, and we do not second guess the ALJ in resolving those conflicts.") Additionally, at the third hearing, the ALJ questioned the vocational expert on the exact issue Brown argues, and the vocational expert testified that a hypothetical individual of Brown's age, education and work experience, who required a cane for all ambulation, to rise from a seated position and for balance and stability, would be able to perform Brown's past relevant work and other jobs that exist in the national economy. (R. at 955-57.)

Brown next argues the ALJ erred by failing to properly evaluate her impairments by improperly substituting the medical opinions with his own lay opinion in crafting the residual functional capacity. (Plaintiff's Brief at 17-22.) Specifically, Brown asserts the ALJ did not base his residual functional capacity finding on any medical opinion, and his finding that Brown was able to complete a 40-hour workweek was not supported by substantial evidence. (Plaintiff's Brief at 17.) Brown argues the ALJ erred by failing to properly evaluate the medical opinion evidence by finding unpersuasive the opinions of two physical therapists, Erica Forrester and Adam Pugh. The Social Security Administration broadly revised its rules regarding the evaluation of medical evidence, with those new rules being applicable to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Here, Brown filed her application in 2019; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions. A medical opinion is defined

in the regulations as a "statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform other demands of work such as seeing, hearing or using other senses and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2025). When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 404.1520c(a) (2025). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (2025) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive [it] will be." 20 C.F.R. § 404.1520c(c)(1) (2025). Likewise, the regulations state that, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources in the claim, the more persuasive [it] will be." 20 C.F.R. § 404.1520c(c)(2) (2025). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding

of the disability program's policies and evidentiary requirements.[5] *See* 20 C.F.R. §§ 404.1520c(b)(2), (c)(3)-(c)(5) (2025).

Brown argues the ALJ erred by failing to properly consider the opinion evidence from physical therapist Erica Forrester. For the reasons that follow, however, I disagree. I, first, note that Forrester did not evaluate Brown until August 17, 2020, more than a year after Brown's date last insured. Forrester found Brown could not use her upper extremities for grasping, pulling/pulling or fine manipulation. (R. at 867.) She found Brown could occasionally bend at the waist with support, she could frequently reach above the shoulder, and she could never squat, climb, kneel, crawl, drive or use foot controls with the right lower extremity. (R. at 867-68.) She found that, in an eight-hour day, Brown was unable to perform lifting and carrying activities. (R. at 868.) Lastly, Forrester noted:

> [Brown] ambulates into the facility with use of a [single point cane], donning a knee brace, ankle brace and requires the hand held assistance of her sister. Per objective testing [Brown] is at a high fall risk. She required at least minimal assistance with all transfers completed in the clinic today as well as use of her cane. Coordination deficits are present to [Brown's right lower extremity and bilateral upper extremities. She] reported increased pain and fatigue with all physical testing completed. She required a break [on] left side lying to relieve pain to be able to finish out physical examination.

(R. at 868.)

[5] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(c)(5) (2025).

In his decision, the ALJ found the opinion provided by Forrester not persuasive, noting many of the suggested limitations were "taken subjectively" or "subjective as above," which he found reduced the supportability of her opinion. (R. at 919.) The ALJ further noted that Forrester "did not adequately explain why [Brown] was effectively unable to perform any exertional activities whatsoever, nor explain why such limitations might be warranted during the period at issue based on their limited observations as noted in August 2020." (R. at 919.) The ALJ further found that the limitations suggested by Forrester were inconsistent with other evidence, such as multiple appointments with no observed cane use prior to the date last insured and Brown's meaningful improvement with treatment. (R. at 919-20.) Brown is correct that an ALJ may not substitute his own opinion "on the severity of [a] plaintiff's … problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McClain*, 715 F.2d at 869). However, the ALJ did not do so in this case. He correctly analyzed the supportability and consistency of Forrester's opinion and found that it was unpersuasive. He did not substitute any medical opinion for that of Forrester's, but merely relied on other evidence in the record, as he was permitted to do.

Brown also argues the ALJ erred by failing to properly consider the opinion evidence of Adam Pugh, another physical therapist. (Plaintiff's Brief at 18.) Again, I disagree. Pugh completed a Clinical Assessment Of Pain on June 29, 2020, opining that Brown's pain was present and found to be incapacitating; physical activity, such as walking, standing and bending increased her pain to the extent that medication and/or bed rest was necessary; and that medication impacted Brown's ability to work to the extent that it would severely limit her effectiveness in the work place due to distraction, inattention and drowsiness. (R. at 852.) In finding Pugh's opinion unpersuasive, the ALJ found the opinion unsupported with respect to the period at issue because Pugh did not explain why Brown would be subject to the limitations

on or before the date last insured. (R. at 920.) The ALJ also noted that, "the statements concerning 'medication and/or bed rest' and 'distraction, inattention, drowsiness, etc.' due to medications are inconsistent with other evidence" reviewed in his decision, such as Brown's grossly alert appearance during encounters with medical providers through December 2018, despite her pain and medication use. (R. at 920.) The ALJ noted that, while Brown occasionally reported side effects with certain medications, she otherwise denied side effects after appropriate medication adjustments. (R. at 920.) In finding Pugh's opinion unpersuasive, the ALJ correctly analyzed the supportability and consistency of the opinion, and he did not substitute his own medical opinion for that of trained medical professionals. Instead, he cited to the lack of internal supportability and the absence of other consistent medical records. Brown argues that, "because these two providers were the only medical sources to report on [Brown's] functional limitations, disregarding their opinions left no medical evidence" on the issue of Brown's limitations. (Plaintiff's Brief at 20.) Therefore, Brown argues, the ALJ impermissibly relied on his own lay opinion to form the residual functional capacity. (Plaintiff's Brief at 20.) I disagree. A residual functional capacity analysis is an agency-conducted administrative assessment that considers all relevant record evidence. *See* 20 C.F.R. § 404.1545(a)(3) ("We will assess your residual functional capacity based on all the relevant medical and other evidence."); Therefore, Brown's suggestion that the ALJ's residual functional capacity analysis "must be set aside simply because the 'the ALJ is a layman and did not obtain an expert medical opinion' misapprehends the agency's administrative review process." *Caulkins v. Kijakazi*, 2022 WL 1768856, at *5 (4th Cir. June 1, 2022) (quoting *Felton-Miller v. Astrue*, 459 F. App'x 226, 230-31 (4th Cir. 2011)).

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now

submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding that Brown required a cane for all ambulation, but not for balance/stability and positional changes;
2. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;
3. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and
4. Substantial evidence exists in the record to support the ALJ's finding that Brown was not disabled under the Act prior to the date last insured and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: July 30, 2026.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE